UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
LUANNE HUSSNATTER,

                    Plaintiff,

                                                    **ORDER**
        -against-                                   **CV-09-3261 (SJF)**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
-------------------------------------------------------X
FEUERSTEIN, J.

        Luanne Hussnatter ("plaintiff") commenced this action pursuant to 42 U.S.C. §§ 405(g) and
1383(c)(3) seeking judicial review of the final determination of defendant Commissioner of Social
Security ("Commissioner") that she is not eligible to receive disability insurance ("DI") benefits or
supplemental security income ("SSI") under the Social Security Act ("the Act"). The Commissioner
now moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure.


I.      **BACKGROUND**

        A.      **Administrative Proceedings**

        Plaintiff is a thirty-eight (38) year old female. (Transcript [Tr.] 30,67, 279). On August 24,
2005, plaintiff filed applications for DI benefits and SSI, (Tr. 67, 266), alleging that she could no
longer work as of January 1, 2000 due to her mental illness, involving depression, anxiety and bipolar
disorder, and physical ailments, including cervicobrachial pain, lower back pain, middle back pain
and cervicogenic headaches. (Tr. 63-65). By letter dated January 26, 2009, plaintiff amended the

onset date of her alleged disability to July 15, 2004, as a result of work activity she performed in 2003 and 2004. (Id; see also Tr. 277). On October 21, 2005, the Social Security Administration ("SSA") denied plaintiff's claims for SSI and DI benefits on the basis that her condition was "not severe enough to keep [her] from working." (Tr. 34-39).

By decision dated March 18, 2008, (Tr. 17-29), following a video hearing at which plaintiff appeared, testified and was represented by counsel, the ALJ concluded that plaintiff was "not disabled under sections 216(i) and 223(d) of the Social Security Act." (Tr. 29). The ALJ found, *inter alia*, (1) that plaintiff had not engaged in substantial gainful activity since the alleged onset date, (Tr. 19); (2) that plaintiff had "the following severe impairments: head, neck and back injuries, sustained in a motor vehicle accident; depression; anxiety; panic attacks; and polysubstance abuse, in remission," (Tr. 19); (3) that plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1," (Tr. 20); (4) that plaintiff "has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)," (Tr. 20); (5) that plaintiff "is unable to perform any past relevant work," (Tr. 27); (6) that plaintiff "has a limited education and is able to communicate in English," (Tr. 28); (7) that "considering [plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform," (Tr. 28); and (8) that plaintiff "has not been under a disability, as defined in the Social Security Act," from the onset date through the date of the ALJ's decision. (Tr. 29).

Plaintiff filed a timely appeal of the ALJ's decision with the Social Security Appeals Council. (Tr.13, 271). On July 17, 2009, the ALJ's ruling became the final decision of the Commissioner after the Appeals Council denied plaintiff's request for review. (Tr. 5). Thereafter, plaintiff commenced

this action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## B. Medical Records

### 1. Prior to the Relevant Period[1]

A "Comprehensive Psychosocial Assessment," dated August 26, 2002, indicates that plaintiff was admitted to Quannacut Outpatient Services at Eastern Long Island Hospital, suffering from cocaine dependancy, alcohol abuse, depressed mood, grief, worthlessness, guilt and irritability, and had a Global Assessment of Functioning ("GAF") of fifty-five (55). (Tr. 130-138). Plaintiff was enrolled in Quannacut's outpatient Family Program and was placed under a "treatment contract" on November 13, 2002 "due to attendance issues." (Tr. 138-141). On December 17, 2002, plaintiff was discharged from Quannacut's Family Program because she "broke her [treatment] contract" as a result of poor attendance. (Tr. 142-145).

Records from the Family Service League ("FSL"), (Tr. 146-155), indicate that on March 1, 2004, plaintiff admitted herself for treatment for a recent relapse on crack cocaine after having been "clean" for approximately fourteen (14) months. (Tr. 147). A "Psychosocial Evaluation Update" dated March 1, 2004 indicates that plaintiff suffered from remorse, anxiety, depression and "anger issues" and had resigned from her position at a treatment center. (Tr. 148). Plaintiff was diagnosed with cocaine and alcohol dependence, and was assessed with a GAF of forty-five (45). (Tr. 150).

---

[1] The relevant period is July 15, 2004, the date at which plaintiff became unable to work, through September 30, 2008, the date that plaintiff was last insured for DI benefits. (Tr. 17).

On March 15, 2004, plaintiff had a psychiatric evaluation at FSL, which was performed by Dr. Sharma. (Tr. 154-155). Dr. Sharma noted plaintiff's psychiatric history as being significant for depression and an attempted suicide when she was nineteen (19) years old. (Tr. 154). Dr. Sharma reported, *inter alia*, that during the evaluation, plaintiff denied suicidal ideation and tendencies; her speech was relevant and coherent; her mood was dysphoric; she was oriented; her memory was intact; her general knowledge fund of information was poor; and her insight and judgment were limited. (Tr. 155). Dr. Sharma diagnosed plaintiff with dysthymic disorder, cocaine dependence and alcohol dependence and assessed her GAF as a fifty-five (55). (Id.). Dr. Sharma prescribed plaintiff Paxil, Wellbutrin and Seroquel and recommended medication/symptom management, individual counseling and group therapy. (Id.).

## 2.  During the Relevant Period

Plaintiff was discharged from the FSL on June 13, 2005 due to "loss of contact." (Tr. 146). The discharge summary indicates that plaintiff's last treatment at FSL was on May 3, 2005 and that her prognosis was poor due to "continued stress at home and [plaintiff's] lack of acceptance about the need to understand and work through emotion." (Tr. 146).

On August 17, 2005, Dr. Zarif, of South Shore Neurologic Associates, P.C., examined plaintiff for a neurologic consultation based on her complaints of increased neck pain and back pain following an April 21, 2005 motor vehicle accident. (Tr. 249). Plaintiff denied any headache, numbness, tingling or weakness associated with the back and neck pain and reported that Motrin provided her minimal relief from the pain. (Id.) Dr. Zarif reported that plaintiff used crack until approximately seventeen and a half months earlier, smoked cigarettes for seventeen (17) years, and worked as a

4

house cleaner. (Tr. 250). Upon physical examination, Dr. Zarif noted that plaintiff's neck and lumbar spine range of motion was mildly limited to flexion and extension; that plaintiff's lumbar spine range of motion was also mildly limited on rotation; that there was paraspinal, cervical and lumbar spine tenderness; that straight leg raising was up to ninety (90) degrees with minimal discomfort in the legs and buttocks; and that plaintiff's motor strength in the upper and lower extremities was 5/5 in all muscle groups. (Id.). Dr. Zarif diagnosed plaintiff with cervical myofascial pain syndrome and low back pain and recommended, *inter alia*, that plaintiff have MRIs performed on her cervical and lumbosacral spine to rule out disc disease; take Motrin six hundred (600) milligrams three (3) times a day; and attend physical therapy. (Tr. 250-251).

An MRI of plaintiff's cervical spine, taken on August 27, 2005 at Brookhaven MRI, was significant for reduction of the normal cervical lordosis; multilevel mild disc bulging resulting in deformity along the ventral margin of the thecal sac at C3-4 through C5-6; and mild left foraminal compromise at C2-3. (Tr. 246-247). An MRI of plaintiff's lumbar spine performed on the same date showed shallow lumbar dextroscoliosis, but was otherwise unremarkable. (Tr. 248).

On August 29, 2005, Dr. Chernik, of Chronic Pain Options of Long Island, completed an "Initial Manual Therapy Evaluation" of plaintiff, during which plaintiff complained of intermittent headaches, chronic cervicobrachial pain and lower back pain following an April 21, 2005 motor vehicle accident. (Tr. 252-253). Examination indicated that plaintiff's active cervical range of motion was restricted at end range of rotation, lateral flexion and extension, but there was no evidence of cervical nerve root compression and/or tension signs; end range of right and left maximal cervical compression test recreated cervicobrachial pain to the trapezius/shoulder region; there was sluggish deep tendon reflexes in the upper extremities with normal motor and sensory evaluation; active

lumbosacral range of motion was restricted at end range of flexion and extension, with no evidence of nerve root compression and/or tension signs; heel and toe walk were within normal limits; double leg raise test was positive with re-creation of lumbosacral pain; Yeoman's test was positive bilaterally; and Kempf's test re-created focal lumbosacral pain extending into the gluteal and sacroiliac joint regions. (T. 253). Upon functional neuromuscular evaluation, Dr. Chernik noted that plaintiff had vertebral joint restriction at L5-S1, right sacroiliac joint, and C3-4; a positive repetitive head and neck flexion coordination test; weakness of the deep neck flexors; hypertonicity of the cervical paraspinal extensors; a positive pelvic tilt test for poor lumbopelvic stability; and a mild right Tendelenburg for functional weakness of the gluteus medius/minimus. (Id.). Dr. Chernik diagnosed plaintiff with cervicobrachial pain syndrome, cervicogenic headaches and lower back pain syndrome, and recommended rehabilitative physical therapy three (3) times a week for four (4) weeks followed by a clinical re-evaluation. (Id.).

During a follow up appointment with Dr. Zarif on September 8, 2005, plaintiff reported minimal improvement in her neck and back pain and did not complain of radiating pain, numbness, tingling or weakness of the upper or lower extremities; headaches; double vision or blurred vision; or difficulty swallowing. (Tr. 244). Dr. Zarif's findings upon physical and neurological examination of plaintiff were consistent with his previous findings. (Id.). Based upon those findings, and the reports of the MRIs of plaintiff's cervical and lumbar spine, Dr. Zarif diagnosed plaintiff with neck and back pain and "myofascial pain syndrome/degenerative joint disease," and recommended that plaintiff have blood work performed to exclude Lyme disease and thyroid abnormality; take Zanaflex; continue physical therapy; and return for re-evaluation in two (2) months. (Id.).

6

From August 25, 2005 to September 22, 2005, plaintiff treated weekly with Dr. Smith, a psychologist, who diagnosed her with depressive disorder not otherwise specified and impulse control disorder not otherwise specified based upon her symptoms of "lability" in mood, irritability, depression, impulse control problems and social skills deficits. (Tr. 156-162). Dr. Smith's prognosis of plaintiff was guarded. (Tr. 157). Upon his functional assessment of plaintiff, Dr. Smith reported: that plaintiff did not always eat and missed meals; that her activities of daily living included showering daily, shopping, cooking, taking care of her son, attending Narcotics Anonymous ("NA") meetings and associating with other NA members; that plaintiff had difficulty maintaining employment, staying on task and was not responsible, especially when using drugs; that plaintiff's understanding and memory were limited, insofar as statements had to be repeated or rephrased; that plaintiff's sustained concentration and persistence were limited, insofar as she had difficulty with authority, getting along with others, was easily overwhelmed and was unable to maintain customary work performance and attendance; that plaintiff's social interaction was limited, insofar as she would have difficulty getting along with co-workers and accepting direction from supervisors, although she would be able to ask simple questions and make her needs and wants known; and that plaintiff's adaptation skills were also limited, insofar as she had difficulty setting realistic goals and working towards them, although she was capable of using transportation and driving. (Tr. 158-159). Dr. Smith opined that plaintiff was not able to work given her clinical presentation. (Tr. 158).

In addition, Dr. Smith noted that plaintiff had a long history of drug and alcohol abuse, including crack, acid and marijuana, but had been in recovery for seventeen (17) months. (Tr. 160). Upon examination, Dr. Smith found plaintiff to be fully oriented and lucid, with no evidence of psychotic process like hallucinations or delusions, and to have impaired judgment; "great difficulty"

7

getting along with others and maintaining relationships; problems with authority and anger-impulse control; a depressed and labile mood; anxiety; poor coping skills; a diffident attitude; a somewhat careless, though clean, appearance; coherent and organized speech; no obvious perceptual disorganization; limited insight, attention and concentration; grossly intact memory; and average information. (Tr. 160-161). Dr. Smith recommended that plaintiff consult with a psychiatrist for medication evaluation. (Id.).

On October 17, 2005, plaintiff commenced psychotherapy with Dr. Shekher for depression and anger management. (Tr. 205-224). At the time of plaintiff's appointment, she had been "clean" for nineteen (19) months and had been off medication for four (4) months. (Tr. 222-223). Plaintiff reported "up and down" moods, increased anxiety and obsessive compulsive symptoms, but denied any panic attacks, psychotic symptoms or suicidal or homicidal ideation. (Tr. 222-223). Dr. Shekher diagnosed plaintiff with bipolar disorder and obsessive compulsive disorder and prescribed her Neurontin, Lexapro and Abilify. (Tr. 217-218).

Plaintiff cancelled two (2) follow up appointments she had scheduled with Dr. Shekher on October 24, 2005 and October 31, 2005. (Tr. 217-218). On November 5, 2005, plaintiff called Dr. Shekher to complain that she was feeling worse and had the urge to use drugs or crack. (Tr. 217). Plaintiff was advised that she could see Dr. Shekher on November 7, 2005 and to go to an emergency room if necessary before then. (Tr. 217). During a telephone call with plaintiff on November 7, 2005, plaintiff stated that she was unable to see Dr. Shekher that day and would call to make an appointment when she was free. (Tr. 217). Plaintiff saw Dr. Shekher on November 8, 2005, but cancelled another follow up appointment on November 14, 2005. (Tr. 216).

During a November 23, 2005 follow-up visit with Dr. Zarif, plaintiff complained of neck

8

pain, with some limited motion, radiating up to the occipital area of her skull, but reported some improvement in her back pain. (Tr. 242-243). Dr. Zarif noted that plaintiff had been diagnosed with "a mild case of depression" one (1) month earlier. (Tr. 242). Dr. Zarif's findings upon physical and neurological examination remained consistent with his original findings and he reiterated his diagnosis of plaintiff as having neck and low back pain, most likely myofascial pain syndrome, superimposed by degenerative joint disease. (Id.). Dr. Zarif prescribed plaintiff Zanaflex, recommended that she take Motrin on an as needed basis, emphasized to her the importance of starting physical therapy and advised her to avoid heavy lifting and trauma. (Id.).

Plaintiff attended a follow up appointment with Dr. Shekher on December 1, 2005, at which time she complained of blurred vision for one (1) week and a migraine. (Tr. 215).

Plaintiff was evaluated by Drs. Chernik and Vaillancourt on December 6, 2005 for pain management, at which time she complained of headaches, relieved by medication; intermittent bilateral cervicobrachial pain, on the right more than left; and continuous bilateral low and mid back pain. (Tr. 237-241). Plaintiff reported that her pain limited her activities of daily living, although she indicated her occupational status as "active." (Tr. 237-238). Musculoskeletal examination revealed that range of motion of plaintiff's neck was restricted in rotation to the right, side bending to the right and flexion; that range of motion in plaintiff's shoulders and low back was normal; that there were segmental vertebral restrictions at C2, C3, T6-L1, L3, L4 and L5; that there were muscle spasms and weakness demonstrated on cervical flexion and shoulder flexion bilaterally; and that there was cervicocranial and iliolumbar ligament instability. (Tr. 240-241). Cardiovascular, pulmonary and neurological examinations were normal. (Tr. 240-241). Drs. Chernik and Vaillancourt diagnosed plaintiff with cervicobrachial pain, low back pain, mid back

9

pain and cervicogenic headache, and recommended acupuncture pain management treatment twice a week for ten (10) visits, followed by re-evaluation. (Tr. 241).

During a December 12, 2005 appointment with Dr. Shekher, plaintiff complained of "extensive anxiety" and some sad moods. (Tr. 214). During a January 2, 2006 appointment, plaintiff reported that her mood was better and stable. (Tr. 213). Plaintiff cancelled follow up appointments with Dr. Shekher that had been scheduled on February 2, 2006 and February 3, 2006. (Tr. 212-213). On February 6, 2006, plaintiff called Dr. Shekher and advised him that she had used crack cocaine. (Tr. 212). Dr. Shekher noted that he had urged plaintiff to go to a drug treatment program or emergency room, but plaintiff stated that she did not want to go to either place. (Id.)

Plaintiff returned to Dr. Shekher on February 17, 2006 complaining that she felt "slightly down" since she used crack cocaine. (Tr. 212). Plaintiff missed follow up appointments with Dr. Shekher that had been scheduled on March 17, 2006 and May 9, 2006. (Tr. 211-212).

During a May 10, 2006 follow-up visit with Dr. Zarif, plaintiff complained of continuous neck and back pain, with the lower back pain "much worse" than the neck pain. (Tr. 235-236). Plaintiff reported that her pain was worse when she sat, stood or walked for long periods of time. (Id.). Dr. Zarif's findings upon physical and neurological examination of plaintiff remained consistent with his original findings and his diagnosis of plaintiff remained the same. (Id.) Dr. Zarif prescribed plaintiff Baclofen; recommended that she start physical therapy and continue taking Motrin as needed; referred her to chronic pain management to assess her pain condition; and advised her to avoid heavy lifting. (Id.).

During a May 16, 2006 appointment with Dr. Shekher, plaintiff reported that she had been

10

sober and free of drugs for seventy (70) days; that she had periods of irritability; that she had been erratic about taking her medication; that she slept seven (7) to eight (8) hours a night, but with interrupted sleep; that her back pain was a significant problem; and that she was going to see a pain management doctor. (Tr. 211). Plaintiff cancelled a follow up appointment with Dr. Shekher scheduled for June 13, 2006. (Tr. 211).

During an August 8, 2006 appointment with Dr. Shekher, plaintiff reported that her mood was "up and down" and irritable; she had been erratic about taking her medication; she did not want to continue taking Abilify but was willing to take Lexapro and Neurontin; she had worked ten (10) hours a week in a deli; she had been sober for five (5) months from cocaine, alcohol and crack; and that she slept from 11:00 p.m. until 6:30 a.m. (Tr. 210).

Plaintiff attended follow up appointments with Dr. Shekher on September 5, 2006 and October 25, 2006. (Tr. 209). During the October 25, 2006 appointment, plaintiff reported that she had been erratic with her medication and was not taking the Abilify. (Id.) Dr. Shekher urged plaintiff to continue taking the Abilify, Neurontin and Lexapro as prescribed. (Id.) Plaintiff did not keep her scheduled appointment on November 22, 2006 and did not return to Dr. Shekher until February 15, 2007. (Tr. 208).

During the February 15, 2007 appointment with Dr. Shekher, plaintiff reported that her mood had been "up and down;" that she had not taken her medication since November 2006; and that she felt frustrated and agitated. (Tr. 208). Dr. Shekher urged plaintiff to take all of her medication regularly. (Id.). Plaintiff cancelled her follow up appointments with Dr. Shekher scheduled on March 15, 2007 and March 29, 2007, and failed to keep her appointments scheduled on April 26, 2007 and May 3, 2007. (Tr. 207-208).

Plaintiff returned to Dr. Shekher on May 14, 2007, at which time she reported that her mood had been fairly stable; that she had been taking the Lexapro and Abilify, which helped her depression and mood swings; and that she had neck and back pain. (Tr. 206).

On June 28, 2007, plaintiff reported to Dr. Shekher that she had been in a car accident while using PCP and had been arrested and charged with driving under the influence ("DUI"). (Tr. 205). Plaintiff informed Dr. Shekher that she had been attending a drug and alcohol program called "Alternatives" twice a week and that she had been more depressed since the motor vehicle accident. (Id.).

On September 12, 2007, plaintiff was admitted to Peconic Bay Medical Center following another motor vehicle accident. (Tr. 197-200). A discharge summary completed by Dr. Owens indicated that plaintiff complained of right foot and ankle pain and mild neck soreness. (Tr. 197). Her past medical history was noted to be significant for depression. (Id.). Physical examination revealed mild localized tenderness at the sacral spine and a laceration on the right lower extremity, confirmed to be a Grade 2 open fracture involving the ankle joint and fibula. (Id.). Plaintiff underwent open reduction internal fixation of the fibula with reconstruction of the lateral ligamentous complex and irrigation and debridement of the compounding wound and open reduction internal fixation of the medial talar body. (Tr. 199). Plaintiff's final diagnosis was depression and "fibular fracture, talus, Grade 2 open compounding wound, disruption anterior lateral ligamentous complex." (Tr. 198). She was discharged on September 14, 2007. (Id.).

A report by Dr. Owens, dated September 18, 2007, indicates that plaintiff's x-rays demonstrated well-aligned fracture fragments with a symmetric mortise; that there was some mild surrounding erythema; that plaintiff was tender to stretch at the toes, but swelling was minimal;

and that plaintiff's sensation was intact. (Tr. 204).

A report dated September 25, 2007 by Dr. Owens indicates that plaintiff's x-rays demonstrated a symmetric mortise and near anatomic alignment of the talus fracture; that plaintiff's wounds were healing well; and that her staples had been removed. (Tr. 203).

Dr. Shekher's records indicate that on September 26, 2007, plaintiff called his office to request that samples of her medication be mailed to her because she had no insurance. (Tr. 205). When Dr. Shekher advised plaintiff that someone had to go to his office to pick up the samples, she told him that she had ankle problems and could not go to the office. (Id.). Dr. Shekher's records indicate no further treatment of plaintiff by him.

An operative report by Dr. Owens, dated October 15, 2007, indicates that screws had been removed from plaintiff's right fibula and medial wall talar and that a short leg cast had been applied. (Tr. 225-226).

On October 18, 2007, Dr. Moreta conducted a neurologic consultation on plaintiff at Dr. Owens's request. (Tr. 232-234). Dr. Moreta's report indicates that following a motor vehicle accident on September 12, 2007, plaintiff suffered a concussion and multiple trauma, including direct injury to her head posteriorly, neck, lower back and right ankle. ( Tr. 232). Plaintiff complained of neck pain radiating to her shoulders bilaterally; lower back pain radiating to her sacroiliac joint and paralumbar areas bilaterally; significant right ankle pain with gradual improvement; and headaches associated with nausea. (Tr. 232). Physical examination revealed severe bilateral occipital tenderness; severe diffuse cervical, lumbosacral, bilateral paraspinal and sacroiliac joint tenderness; limited neck flexion and lateral rotation bilaterally; and straight leg raising elicited exacerbation of lower back pain with radiating pain to the sacroiliac area and

13

sciatic notch. (Tr. 232-233). Neurologic examination was within normal limits. (Tr. 233). Dr. Moreta diagnosed plaintiff with concussion, persistent headache with nausea, cervical and lumbosacral sprain and post traumatic cervical and lumbosacral myofascial pain with radiating pain to the shoulders and the sacroiliac and sciatic notches. (Tr. 234). Dr. Moreta recommended a brain MRI to evaluate for cerebral contusion and subdural hematoma; an EEG to evaluate for focal seizure; cervical and lumbosacral MRIs to evaluate for herniated discs; and physical therapy. (Id.). Dr. Moreta prescribed plaintiff Flexeril and Vicodin. (Id.).

An MRI of plaintiff's cervical spine, performed at Brookhaven MRI on November 25, 2007, revealed no interval changes; minimal disc bulges at the levels of C3-4 through C6-7, along with minimal left neural foraminal narrowing at C2-3; and straightening of the cervical lordosis, likely due to muscle spasm. (Tr. 230-231). No evidence of cord or nerve root compression was indicated. (Tr. 230).

During a follow-up visit with Dr. Moreta on December 6, 2007, (Tr. 227-229), plaintiff complained of headaches; neck pain radiating into her shoulders bilaterally; low back pain radiating into her sacroiliac and bilateral lumbar paraspinal areas; and significant right foot and ankle pain. (Tr. 227). Dr. Moreta noted that an MRI of plaintiff's lumbar spine was normal. (Id.). Dr. Moreta's findings on physical and neurologic examination of plaintiff were consistent with his findings during his initial examination. (Tr. 227-229). Dr. Moreta diagnosed plaintiff with concussion, post traumatic headache, cervical lumbosacral sprain and post traumatic myofascial pain, and recommended that plaintiff take Vicodin and Flexeril, have a brain MRI and go for pain management. (Tr. 229).

Plaintiff also treated with Christopher Zeoli, a psychiatric nurse practitioner at Alternatives

Counseling Center. (Tr. 260-265). On December 12, 2007, Zeoli reported that plaintiff had a history of crack/PCP use, depression, anxiety, a compound fracture to her right ankle requiring surgical intervention following a September 2007 motor vehicle accident, herniated cervical discs, lumbar muscular pain resulting in chronic pain issues and carpal tunnel syndrome. (Tr. 260, 264). Plaintiff reported sleeping seven (7) hours per night with no sleep disturbances; having an increased appetite, which concerned her; and having last used crack on November 15, 2007. (Tr. 260, 264). In his nursing medical assessment report, Zeoli noted that plaintiff was cooperative, alert and oriented; her mood was "off the wall", irritable and labile; her affect was "blunted;" her speech was normal, but "somewhat monotone;" her thought process and content showed rapid, normal and logical thinking; her abstract thinking was average; she did not report any hallucinations or perceptual disorders; her memory and attention span were good; she denied suicidal and homicidal ideation and past suicide attempts, but reported a history of self-mutilation when she was nineteen (19) years old; and her impulse control, level of insight, concentration and judgement were fair. (Tr. 262-263). Zeoli diagnosed plaintiff with bipolar II disorder, disc herniations, right ankle injury and chronic pain issues, and assigned her a GAF of fifty (50). (Tr. 263).

On December 18, 2007, Dr. Besser conducted an EMG/nerve conduction test on plaintiff as a result of her complaints of hand numbness and cervical neck pain, in order to rule out bilateral carpal tunnel syndrome versus cervical radiculopathy. (Tr. 201-202). Neurologic examination showed no focal weakness or reflex asymmetry and the test results were consistent with moderate entrapment of the median nerves at the wrists with no significant axonal degeneration and no definitive evidence of cervical radiculopathy. (Id.).

During a January 2, 2008 follow up appointment, Zeoli noted that plaintiff appeared stable, although "a little emotionally sensitive at times" and mildly depressed. (Tr. 259). Plaintiff's chief complaint at that time was poor sleep. (Id.) Zeoli prescribed plaintiff Trazodone and advised her to continue taking the Abilify and to restart her Neurontin. (Id.)

On January 23, 2008, Zeoli completed a "Medical Assessment of Claimant's Ability to Perform Work Related Activities in a Mental Impairment Claim,"(Tr. 256-258), in which he indicated, *inter alia*: (1) that plaintiff was markedly impaired in her ability to make occupational adjustments, i.e., to follow work rules, relate to co-workers, deal with the public and work stresses, use judgment, interact with her supervisors, function independently and maintain attention and concentration; (2) that plaintiff was markedly impaired in her ability to understand, remember and carry out complex and detailed job instructions, but had a fair ability to understand, remember and carry out simple job instructions; and (3) that plaintiff was markedly impaired in her ability to behave in an emotionally stable manner and relate predictably in social situations, but had a fair ability to maintain her personal appearance, demonstrate reliability and maintain schedules in her daily routine. (Tr. 256-258). Zeoli based his assessment on a finding that plaintiff's "psychiatric symptoms impair[ed] her functioning." (Tr. 256-258).

### 3. SSA's Medical Consultants

#### a. Physical

On September 30, 2005, Dr. Tivakaran, an SSA consultant, performed a complete physical examination on plaintiff. (Tr. 163-167). At the time of the examination, plaintiff was thirty-three (33) years old and had a past medical history of depression, anxiety, polysubstance abuse, low

back and neck pain and cervical disk disease. (Tr. 163). According to Dr. Tivakaran, MRIs of plaintiff's lumbar and cervical spine were consistent with degenerative disk disease. (Id.). Dr. Tivakaran noted that following an April 2005 motor vehicle accident, plaintiff attended physical therapy three (3) times a week for her neck and back, which she reported had helped her symptoms "a little bit." (Id.). Plaintiff reported that she also took Motrin as needed for her neck pain and that she had last worked in 1998, but stopped working because of her substance abuse. (Id.). Plaintiff denied any chest pain, shortness of breath or difficulty moving her hands and legs. (Id.). She reported her activities of daily living as including cooking and cleaning seven (7) days a week; doing laundry and going shopping once a week; bathing and dressing herself daily; and watching television, reading, socializing with friends and attending physical therapy in her free time. (Tr. 164). Upon physical examination, plaintiff was reported as being five (5) feet two (2) inches tall and weighing one hundred ninety-five (195) pounds; she had a normal gait; she could walk on her heels and toes without difficulty; her squat was full; her stance was normal; she used no assistive devices; she did not need help changing for the examination or getting on and off the examination table; she was able to rise from a chair without difficulty; her cervical spine showed full range of motion bilaterally on flexion, extension, lateral flexion and rotation; there was no evidence of scoliosis or abnormality in her thoracic spine; pain was elicited with range of motion examination of her lumbosacral spine; straight leg raising was negative bilaterally; there was full range of motion of her shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally; her strength was 5/5 in the upper and lower extremities; her joints were stable and nontender, with no redness, heat, swelling or effusion; deep tendon reflexes were "physiologic and equal" in her upper and lower extremities, with no motor or sensory deficit; no muscle atrophy was evident in

17

her extremities; her hand and finger dexterity were intact; and her grip strength was 5/5 bilaterally. (Tr. 164-165). An x-ray of plaintiff's lumbar sacral spine taken during the examination revealed no bony or disc space pathology. (Tr. 167). Dr. Tivakaran diagnosed plaintiff with depression, anxiety, polysubstance abuse and low back pain; reported that her prognosis was stable; and opined that plaintiff was mildly limited from heavy lifting, pushing, pulling and carrying secondary to her lumbar and cervical disc disease. (Tr. 166).

### b.    Psychiatric

Dr. Herman performed a psychiatric evaluation of plaintiff on September 30, 2005, (Tr. 168-171), during which plaintiff reported that she had last been employed in 2003 as a housekeeper but left due to relapse on drugs; that although she had never been hospitalized for psychiatric treatment, she had received outpatient treatment for approximately one (1) year at the age of eleven (11) due to mood difficulties; that she had recently started outpatient psychotherapy; and that she had been prescribed, and had taken, Wellbutrin, Paxil and Seroquel in the past. (Id.). Plaintiff complained of back pain, arthritis, scoliosis and three (3) bulging disks in her neck, but denied taking any medication for those ailments. (Id.). Plaintiff further complained that she frequently awoke at night due to back pain; that she lost fifteen (15) pounds, but had a normal appetite and was trying to lose weight; that she believed she had symptoms of an obsessive compulsive disorder; and that she had crying spells, occasionally did not want to be around others and often felt anxious, irritable, impulsive, angry and "rageful." (Tr. 168-169). Upon mental status examination, Dr. Herman found plaintiff to be cooperative; to have adequate social skills; to be adequately groomed; to have no abnormalities in gait, posture, motor behavior or eye contact;

18

to have coherent and goal directed thought process with no evidence of hallucinations, delusions or paranoia; to have full range of affect and appropriate speech and thought content; to have "neutral" mood; to be fully oriented; to have intact attention, concentration and memory skills; to have average cognitive functioning and a "somewhat limited" general fund of information; and to have fair insight and judgment. (Tr. 169-170). Plaintiff reported good socialization and family relationships and no significant difficulties with activities of daily living related to her psychological or psychiatric issues. (Tr. 170). Plaintiff identified her hobbies and interests as watching television; reading; attending meetings, counseling and physical therapy; and socializing with friends. (Id.). In addition, plaintiff reported that she takes care of her home and her children. (Tr. 170).

Dr. Herman opined that plaintiff appeared capable of following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, maintaining a regular schedule and learning new tasks, but "may have difficulty" performing complex tasks, making appropriate decisions, relating adequately with others and appropriately dealing with stress. (Tr. 170). In addition, Dr. Herman noted that plaintiff would not be able to manage her own funds due to her history of substance difficulties. (Tr. 171). According to Dr. Herman, the results of his examination of plaintiff appeared "to be consistent with psychiatric and history of substance problems," but did not appear "to be consistent enough to interfere with [her] ability to function on a daily basis." (Tr. 170). Dr. Herman diagnosed plaintiff with a history of polysubstance dependence; personality disorder, not otherwise specified, with borderline features; back pain; arthritis; scoliosis; and three (3) bulging disks in her neck. (Tr. 171). He recommended that plaintiff continue with psychological treatment and followup

19

with psychiatric treatment, and suggested that plaintiff may benefit from vocational training and rehabilitation. (Id.). Dr. Herman's prognosis of plaintiff was "guarded, given [her] history of substances and psychiatric difficulties." (Tr. 171).

### 4. SSA's RFC Assessment

#### a. Physical RFC

On October 12, 2005, E. Diaz, a disability analyst, evaluated evidence in the plaintiff's file in order to determine her physical residual functional capacity ("RFC"). (Tr. 172-178). According to Diaz's RFC assessment, plaintiff can occasionally lift and/or carry fifty (50) pounds; frequently lift and/or carry twenty-five (25) pounds; sit, stand and/or walk (with normal breaks) for a total of about six (6) hours in an eight (8) hour workday; and has the unlimited ability to push and/or pull (including operation of hand and/or foot controls). (Tr. 173). Diaz based his assessment of plaintiff's exertional limitations on the following evidence: plaintiff's gait was normal; she was able to walk on her heels and toes; she was able to squat; she had no difficulty getting on and off the examination table or arising from a sitting position; she had full range of motion in her cervical spine and upper extremities, although she complained of lower back pain, and straight leg raising was negative bilaterally; there was no evidence of redness, swelling, heat or effusion in any of plaintiff's joints; her motor power in the upper and lower extremities was 5/5; there was no evidence of any sensory, reflex or motor abnormality; and the x-ray of plaintiff's lumbosacral spine was normal. (Id.). Diaz further opined that plaintiff could frequently climb, balance, stoop, kneel, crouch and crawl and had no manipulative, visual, communicative or environmental limitations. (Tr. 174-175). Although Diaz partially credited plaintiff's claim that

20

she was unable to walk more than two (2) blocks as a result of her neck and low back pain, he did not credit her limitation to the degree she alleged because, *inter alia*, she is able to take care of her personal needs, household chores and toddler son; to drive unaccompanied; and to attend physical therapy. (Tr. 176).

### b.      Mental RFC

On October 14, 2005, Dr. Kessel evaluated plaintiff's file in order to assess her mental RFC. (Tr. 179-196). Dr. Kessel assessed no significant limitation in plaintiff's understanding, memory and sustained concentration and persistence, although he found her to be moderately limited in her ability to work in coordination with, or in proximity to, others without being distracted by them. (Tr. 179). In addition, Dr. Kessel assessed no significant limitation in plaintiff's social interaction, although he found her to be moderately limited in her ability to accept instructions, respond appropriately to criticism from supervisors and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 180). Furthermore, Dr. Kessel assessed no significant limitation in plaintiff's adaptation abilities, although he found her to be moderately limited in her ability to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (Id.). By way of explanation for his RFC assessment, Dr. Kessel noted that plaintiff had not worked recently without being on drugs, was independent in her activities of daily living and travel and was cognitively intact. (Tr. 181). According to Dr. Kessel, plaintiff's treating physician did not formally assess her ability to concentrate. (Id.). Dr. Kessel reported that given plaintiff's history of "impulsivity" and poor temper control, she appeared to have some limitations in her social

21

interaction and adaptation skills, but that those limitations were "less than significant." (Id.). Dr. Kessel opined that plaintiff could understand, remember and carry out simple and detailed instructions; concentrate for extended periods of time; relate adequately to coworkers and supervisors; and adapt adequately to changes in the work environment. (Tr. 182). Dr. Kessel concluded that plaintiff had the following medically determinable impairments: (1) a depressive disorder, not otherwise specified, but her depressive symptoms did not fulfill the criteria for a major depressive disorder or bipolar disorder; (2) a personality disorder, not otherwise specified, insofar as plaintiff exhibited features of a mixed personality disorder with impulsive and borderline traits; and (3) a polysubstance dependence in remission, insofar as at the time of the report, plaintiff had been abstinent from active substance abuse. (Tr. 191). In rating plaintiff's functional limitations, Dr. Kessel found that plaintiff was mildly limited in her activities of daily living and in her ability to maintain concentration, persistence or pace; and moderately limited in her ability to maintain social functioning. (Tr. 193).

## C.    Non-Medical Records

### 1.    Disability Reports

An initial disability report (Form SSA-3367), completed on behalf of plaintiff by the Social Security field office on August 25, 2005, (Tr. 81-84), indicates that plaintiff had problems with depression and a mood disorder since 2000 and back problems since her first car accident in 1991, but that she continued to work when she could. (Tr. 81). During the initial interview, plaintiff was observed to be calm and well-mannered, and was reported to have had no difficulty answering questions. (Tr. 83).

Another disability report (Form SSA-3368), completed on plaintiff's behalf on August 25, 2005, (Tr. 85-91), identifies plaintiff's alleged impairments as depression, a mood disorder, obsessive compulsive disorder and back problems due to two (2) motor vehicle accidents in 1991 and 2005. (Tr. 85). The report further indicates that plaintiff irritated easily; had difficulty dealing with, and being around, people; had problems with her back and being on her feet too long; and was easily overwhelmed. (Tr. 85-86). In addition, the report indicates that plaintiff's alleged impairments caused her to be fired from her job and to relapse into drugs, and were the cause of her inability to work. (Id.). The report also notes that the highest grade of school that plaintiff completed was the eleventh (11th) grade and that plaintiff's past work experience included positions as cashier, deli counter person, housekeeper and waitress. (Tr. 90).

### 2.    Work History Report

A work history report completed on plaintiff's behalf on August 31, 2005 notes that plaintiff previously worked as a cashier, deli slicer, waitress and housekeeper from 1985 until the onset of her alleged disability. (Tr. 92-99, 129).

### 3.    Function Report

Plaintiff completed a function report on August 31, 2005, (Tr. 110-120), in which she indicated, *inter alia*, that: (1) although her depression and back pain caused certain limitations in her ability to take care of herself, she did not have any problems with personal care; (2) she prepared her meals daily, although she sometimes forgot to eat; (3) she engaged in certain household chores such as doing laundry, but needed help carrying the laundry basket; (4) she went

23

out everyday, could go out alone and could drive; (5) she shopped for groceries and household items that were needed once a week; (6) she cared for, and played with, her son; (7) she attended meetings and physical therapy; (8) she had difficulty sleeping, getting along with people with authority and concentrating; (9) she was able to pay her bills, count change and handle money; (10) she could socialize with others and walk two (2) blocks; and (11) she could follow instructions, although she occasionally had difficulty with her comprehension. (Tr. 111-114).

## D.    Hearing

### 1.    Plaintiff's Testimony (Tr. 275-299)

Plaintiff testified that she attended school through the eleventh grade, never received a GED or any vocational training, and last regularly worked as of July 15, 2004. (Tr. 282-283). However, plaintiff also testified that she worked as a counter person in the deli section of a store for thirty (30) hours a week from June 2007 until August 2007, which involved standing. (Tr. 283). According to plaintiff, she left that job in August 2007 because she was "a little overwhelmed" and depressed. (Tr. 284). In addition, plaintiff testified that she had worked at Wal-Mart for two (2) weeks, but left that position because she "was too overwhelmed" and could not work the night shifts because of her children. (Tr. 284-285). According to plaintiff, she "got along great with [the] customers" and is a "people person." (Tr. 285). Furthermore, plaintiff testified that she worked as a cook at a deli for approximately twenty (20) hours a week from April 2006 until December 2006. (Tr. 285). According to plaintiff, she liked that job a lot, and liked the people, but was fired when she called in sick. (Tr. 285-286). Plaintiff testified that her last full time job was as a counter person and waitress at a restaurant from 1995 until 1999. (Tr. 286).

24

However, she also testified that she worked briefly as a waitress at another restaurant in 2001, until it closed. (Tr. 287). Plaintiff also worked as a cashier and deli worker for seven (7) to nine (9) months, and as a deli person for a supermarket for five (5) years. (Tr. 287).

Plaintiff testified that she started having mental issues when she was in her late teens or early twenties, for which she first received treatment when she was in her early twenties. (Tr. 288). According to plaintiff, she was first diagnosed with depression when she was twenty-five (25) years old, at which time she "was medicated and placed in [Wind's Way at] Southold." (Tr. 289-290).

Plaintiff also testified that she started using cocaine in her twenties because she "couldn't cope with life" and was "very depressed." (Tr. 290). According to plaintiff, she attends Narcotics Anonymous meetings six (6) nights a week, (Tr. 298), and receives relapse prevention and one-on-one counseling with a nurse practitioner at Alternatives for one (1) hour twice a week for her depression. (Tr. 289-291). Plaintiff testified that prior to being treated at Alternatives, she received counseling from Dr. Shekher, but was unable to continue counseling with him because she lost her health insurance. (Tr. 289-290). In addition, plaintiff testified that she feels like she finally "got the right amount of medication" and is "okay" and that she no longer has the desire to use cocaine. (Tr. 290-291).

Plaintiff testified that she was diagnosed with bipolar disorder based upon her "racing thoughts", depression and anxiety. (Tr. 297). According to plaintiff, her "racing thoughts" drive her crazy" and her feelings of depression vary from day to day and affect her life and children. (Tr. 297). Plaintiff further testified that there are days she feels that she cannot get out of bed, although she is never prevented from taking care of her children. (Tr. 297-298). Plaintiff testified

that her depression and anxiety prevent her from returning to any kind of work because she has "a hard time. . . holding things," she gets overanxious or overwhelmed and she cannot take on too many tasks. (Tr. 293). She further testified that she occasionally has memory problems. (Tr. 295-296).

Plaintiff testified that as a result of injuries she sustained in motor vehicle accidents, she is "really careful" about how much weight she carries. (Tr. 293-294). However, plaintiff testified that there were no medical restrictions put on her and that she can lift fifteen (15) or twenty (20) pounds without any major discomfort. (Tr. 293-294). Plaintiff also testified that she cannot sit for long periods of time without changing positions because of lower back pain; that she can stand and walk around, but not for long periods of time; that she has difficulty descending steps and walks with a limp as a result of her ankle injury; that she had no problems driving short distances prior to the September 12, 2007 motor vehicle accident, but cannot sit in a car for too long following that accident; and that she is able to go grocery shopping by herself. (Tr. 296-297, 281-282).

When asked how she spends her days, plaintiff testified that she spends time with, and cares for, her children; she cleans "a little bit;" she does laundry with the help of her older children, who carry the laundry basket; she reads books; she cooks; and she attends NA meetings six (6) nights a weeks, doctor's appointments and church. (Tr. 280, 293-295, 298).

### 2. Vocational Expert's Testimony (Tr. 299-303)

Mitchell A. Schmidt testified as a vocational expert. (Tr. 299-303). According to Schmidt, plaintiff's past jobs as a cashier and deli slicer are considered light duty, unskilled jobs,

and her past jobs as a waitress, grill cook and counter clerk are considered light duty, semi-skilled jobs. (Tr. 300). Mr. Schmidt testified that plaintiff's past job skills do not readily transfer into any semi-skilled sedentary jobs. (Tr. 301).

The ALJ presented Mr. Schmidt with the following hypothetical and asked him to assume that the hypothetical referred to an individual of a similar age, education and past work experience as plaintiff: an individual is limited to sedentary work; has the opportunity to alternate from sitting to standing during the work day; is limited to understanding and remembering only simple, routine instructions and carrying out repetitive tasks; and has the ability to make simple, work-related decisions, use common sense and deal with a few, or minor, work setting changes. (Id.). According to Mr. Schmidt, such an individual would not be able to perform any of plaintiff's past relevant work, but would be able to work in some sedentary, unskilled occupations. ((Tr. 302). For example, the individual could be an Addresser (DOT code 209.587-010) or a Document Preparer (DOT code 249.587-018) which are both considered to be sedentary, unskilled work, SVP 2. (Id.). Mr. Schmidt testified that according to the New York Department of Labor, there are one thousand three hundred (1,300) addresser jobs in the Long Island region; five hundred seventy-five thousand (575,000) addresser jobs nationally; two thousand two hundred (2,200) document preparer jobs in the Long Island region; and one million one hundred thousand (1,100,000) document preparer jobs nationally. (Id.).

The ALJ then asked Mr. Schmidt if difficulty maintaining attention to tasks for a two (2) hour increment of time, whether caused by depression, pain or otherwise, would have an impact on an individual's ability to perform the suggested occupations. (Id.). Mr. Schmidt testified that such an additional consideration would preclude any kind of competitive employment. (Id.).

27

### E.    The ALJ's Decision

After applying the five-step sequential analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920, the ALJ found that plaintiff was "not disabled" within the meaning of the Act. Specifically, the ALJ determined: (1) that plaintiff had not engaged in substantial gainful activity since the alleged onset date, (Tr. 19); (2) that plaintiff had severe medically determinable impairments, including head, neck and back injuries, depression, anxiety, panic attacks and polysubstance abuse, in remission, (Id.); (3) that plaintiff's impairments did not meet or medically equal any of the Listings, (Tr. 20); (4) that plaintiff possessed the residual functional capacity to perform sedentary work but was unable to perform her past relevant work, (Tr. 27); (5) that plaintiff could perform other work that exists in significant numbers in the national economy, (Tr. 28); and, therefore, (6) that plaintiff was not disabled under the Act. (Tr. 29).

## II.    DISCUSSION

### A.    Standard of Review

The applicable standard of review under 42 U.S.C. § 405(g) is "whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." Green-Younger v. Barnhart, 335 F.3d 99, 105 (2d Cir. 2003). The Supreme Court has interpreted "supported by substantial evidence to mean "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); see also Genier v. Astrue ("Genier II"), 606 F.3d 46, 49 (2d Cir. 2010). "To determine whether the [Commissioner's] findings are supported by substantial

evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Monguer v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)).

Although the Commissioner's findings of fact are binding as long as they are supported by substantial evidence, this deferential standard of review is inapplicable to the Commissioner's conclusions of law or application of legal standards. Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). Rather, courts have a statutory and constitutional duty to ensure that the Commissioner has applied the correct legal standards, regardless of whether the Commissioner's decision is supported by substantial evidence. Pollard v. Halter, 377 F.3d 183, 188-189 (2d Cir. 2004). If a court finds that the Commissioner has failed to apply the correct legal standards, the Commissioner's decision must be reversed, Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008), unless the error was harmless. Cf. Pollard, 377 F.3d at 189 (holding that the Commissioner's decision must be reversed "[w]here an error of law has been made *that might have affected the disposition of the case.*" (emphasis added)).

Pursuant to 42 U.S.C. § 405(g), upon review of the final decision of the Commissioner, a court may enter judgment "affirming, modifying, or reversing the decision...with or without remanding the cause for a rehearing." See Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004) (quoting 42 U.S.C. § 405(g)). However, remand is appropriate when the court finds that there are gaps in the administrative record or that the ALJ has applied an improper legal standard, see Butts, 388 F.3d at 385-6; Williams v. Apfel, 204 F.3d 48, 50 (2d Cir. 1999), or when the court is "unable to fathom the ALJ's rationale in relation to the evidence in the record without further findings or clearer explanation for the decision." Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (quoting

Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)) (internal quotations omitted); see also Salmini v. Commissioner of Social Sec., ___ Fed. Appx. ___, 2010 WL 1170133, at *1 (2d Cir. Mar. 25, 2010) (summary order).

### B.     Evaluation of Disability

Titles II and XVI of the Social Security Act ("the Act"), relating to the denial of disability benefits and social security income, respectively, define "disability," in relevant part, as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B). "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under [Titles II and XVI of the Act], the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of

30

impairments, the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. § 423(d)(2)(B); 42 U.S.C. § 1382c(a)(3)(G); see also 20 C.F.R. §§ 404.1523; 416.923. As defined by the Act, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(D).

Pursuant to regulations promulgated under the Act, the Commissioner is required to apply a five-step sequential analysis to determine whether an individual is disabled under Titles II and XVI of the Act. 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-1, 107 S.Ct. 2287, 96 L.ed.2d 119 (1987); Shaw v. Chater, 221 F.3d 126, 131-2 (2d Cir. 2000). The first step of the sequential analysis requires the Commissioner to determine whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i) and (b); 416.920(a)(4)(i) and (b). If the claimant is not engaged in any "substantial gainful activity," the Commissioner next considers the medical severity of the claimant's impairment to determine whether he or she has a "severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509 [or § 416.909], or a combination of impairments that is severe and meets the duration requirement." See 20 C.F.R. §§ 404.1520 (a)(4)(ii); 416.920(a)(4)(ii). Under this second step of the sequential analysis, it must be determined whether the claimant's impairment or combination of impairments "significantly limits [his or her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c). At the third step, the Commissioner again considers the medical severity of the claimant's impairment to determine whether it "meets or equals one of [the] listings in appendix 1 to subpart

31

P of 20 C.F.R. Part 404 of [the Act] ["the Listings"] and meets the duration requirement." 20 C.F.R. §§ 416.920(a)(4)(iii) and (d); see 404.1520(a)(4)(iii) and (d). If the claimant's impairment does not meet or equal any of the Listings or meet the applicable duration requirement, the Commissioner must assess and determine the claimant's residual functional capacity, 20 C.F.R. §§ 404.1520(e); 416.920(e), and, at the fourth step of the sequential analysis, compare it to the physical and mental demands of the claimant's past relevant work in order to determine whether he or she can engage in his or her past work. See 20 C.F.R. §§ 404.1520(a)(4)(iv) and (f); 416.920(a)(4)(iv) and (f). At the last step of the sequential analysis, the Commissioner must assess the claimant's residual functional capacity, together with relevant vocational factors, i.e., the claimant's age, education and work experience, in order to determine if the claimant "can make an adjustment to other work" existing in the national economy. See 20 C.F.R. §§ 404.1520(a)(4)(v) and (g); 404.1560(c), 416.920(a)(4)(v) and (g). The claimant has the burden of proving the first four (4) steps of the sequential analysis, whereas the Commissioner has the burden of proof on the fifth step of the analysis. See Kohler, 546 F.3d 260, 265 (quoting Perez v. Chater, 77 F.3d. 41, 46 (2d Cir. 1996).

### 1. Special Evaluation of Mental Impairments

In addition to the five-step sequential analysis, the Commissioner must apply a "special technique" set forth in the regulations at the second and third steps of the analysis to determine the severity of a claimant's mental impairments. See Kohler, 546 F.3d at 265; 20 C.F.R. §§ 404.1520a(a); 416.920a(a). Under the special technique, the Commissioner "must first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [he or

she] ha[s] a medically determinable mental impairment(s)." 20 C.F.R. §§ 404.1520a(b)(1);

416.920a(b)(1). The regulations require the Commissioner to "specify the symptoms, signs, and

laboratory findings that substantiate the presence of [a medically determinable mental

impairment(s)] and document [his] findings in accordance with [the regulations]." 20 C.F.R. §§

404.1520a(b)(1) and 416.920a(b)(1). Next, the Commissioner must "rate the degree of functional

limitation resulting from the impairment(s) * * * and record [his] findings as set out in [the

regulations]." 20 C.F.R. §§ 404.1520a(b)(2) and 416.920a(b)(2).

The rating of the degree of a claimant's functional limitation is "based on the extent to

which [his or her] impairments(s) interferes with [his or her] ability to function independently,

appropriately, effectively, and on a sustained basis." 20 C.F.R. §§ 404.1520a(c)(2);

416.920a(c)(2). The Commissioner must "consider such factors as the quality and level of [the

claimant's] overall functional performance, any episodic limitations, the amount of supervision or

assistance [the claimant] require[s], and the settings in which [the claimant] is able to function."

20 C.F.R. §§ 404.1520a(c)(2); 416.920a(c)(2). There are "four broad functional areas" in which

the Commissioner must rate the degree of the claimant's functional limitation: "[a]ctivities of

daily living; social functioning; concentration, persistence, or pace; and episodes of

decompensation." 20 C.F.R. §§ 404.1520a(c)(3); 416.920a(c)(3); see 12.00C of the Listing of

Impairments.

Once the Commissioner rates the degree of functional limitation resulting from the

claimant's impairment(s), he must determine the severity of the claimant's mental impairment(s).

20 C.F.R. §§ 404.1520a(d); 416.920a(d). If the Commissioner rates the degree of the claimant's

limitation in the functional areas of activities of daily living, social functioning and concentration,

persistence or pace as "none" or "mild," and the episodes of decompensation as "none," he should generally conclude that the claimant's mental impairment(s) are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities * * *." 20 C.F.R. §§ 404.1520a(d)(1); 416.920a(d)(1). If the Commissioner determines that the claimant's mental impairment(s) is severe, he must then determine if "it meets or is equivalent in severity to a listed mental disorder[,] * * * by comparing the medical findings about [the claimant's] impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder." 20 C.F.R. §§ 404.1520a(d)(2); 416.920a(d)(2).

If the Commissioner determines that the claimant has a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, he must then assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3); 416.920a(d)(3).

### C. Application of the Five-Step Sequential Analysis and Special Technique

#### 1.    Step Two[2]

Plaintiff's argument that the ALJ did not properly assess the severity of her mental impairment and the extent to which it further eroded her occupational base is without merit.

SSA regulations provide, in relevant part, that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a); 416.921(a). "Basic work activities" is defined as "the abilities and aptitudes necessary to do most jobs. Examples * * * include– (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling,

---

[2] Neither party challenges the ALJ's findings at the first step of the sequential analysis.

reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting." 20 C.F.R. § § 404.1521(b), 416.921(b).

Generally, the second step of the sequential analysis requires the Commissioner to consider "the combined effect of a claimant's impairments" and to "evaluate their combined impact on a claimant's ability to work, regardless of whether every impairment is severe." Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995). The second step of the sequential analysis allows the Commissioner "to deny a claim for benefits on the basis of a relatively simple threshold determination of the claimant's ability to perform basic, generally defined work functions, without * * * engaging in the rather more burdensome medical-vocational analysis required by [the Act] (and applied in steps 4 and 5)." Dixon at 1022.

The ALJ found that plaintiff had both medically determinable physical impairments, i.e., head, neck and back injuries, and medically determinable mental impairments, i.e., depression, anxiety, panic attacks, and polysubstance abuse. (Tr. 19). The ALJ rated the degree of plaintiff's functional impairment resulting from the mental impairments as "mild" in the areas of activities of daily living, social functioning and concentration, persistence or pace, and found that plaintiff had "not experienced any episodes of decompensation." (Tr. 20). Nonetheless, the ALJ concluded that plaintiff's physical and mental impairments were severe. Accordingly, the ALJ's determination at the second step of the sequential analysis was actually favorable to plaintiff and, in any event, was in accordance with the applicable legal standard and is supported by substantial evidence in the record.

35

## 2.    Step Three

Since the ALJ concluded that plaintiff suffered from severe medically determinable impairments at the second step of the sequential analysis, (Tr. 19-20), he properly proceeded to the third step of the analysis. <u>See</u> 20 C.F.R. §§ 404.1520(a), 416.920(a), 404.1520a(d)(2), 416.920a(d)(2). At the third step, the ALJ properly compared plaintiff's mental impairments and his rating of the degree of plaintiff's functional limitation resulting from those impairments to the criteria of listings at 12.04 (guidelines for evaluating Affective Disorders) and 12.09 (guidelines for evaluating Substance Addiction Disorders) of the Listings.[3] (Tr. 20). The ALJ then appropriately proceeded to assess plaintiff's residual functional capacity. Accordingly, the ALJ evaluated the severity of plaintiff's medical impairments, both physical and mental, in accordance with the appropriate legal standard and his finding at step three of the sequential analysis is supported by substantial evidence in the record.

### a.    The Treating Physician Rule

Plaintiff's contention that the ALJ improperly afforded reduced weight to the functional assessment of Zeoli, a treating source, (Pl. Mem. at 5-7), is without merit.

The Second Circuit has held that:

> "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant. 'A treating physician's statement that the claimant is disabled cannot itself be determinative.' <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999). However, SSA regulations advise claimants that 'a treating source's opinion on the issue(s) of the *nature and severity of your impairment(s)*' will be given 'controlling weight' if the opinion is

---

[3] Plaintiff does not challenge the ALJ's application of the third step of the sequential analysis with respect to her physical impairments.

'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' 20 C.F.R. § 404.1527(d)(2) (emphasis added)."

Greener-Younger, 335 F.3d at 106.

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, * * * the opinion of the treating physician is not afforded controlling weight where * * * the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citations omitted); see also Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (accord); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (holding that while the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).

SSA regulations require that an ALJ who refuses to afford controlling weight to the medical opinion of a treating physician consider the following factors in determining how much weight to accord the opinion: (1) the frequency of the examination and the length, nature and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the treating physician's opinion with the record as a whole; (4) whether the treating physician is a specialist; and (5) other factors brought to the ALJ's attention that tend to support or contradict the treating physician's opinion. 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2); see Burgess, 537 F.3d at 129; Halloran, 362 F.3d at 32. The Commissioner must provide "good reasons" for the lack of weight attributed to the treating physician's opinion. Halloran, 362 F.3d at 32; 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).

Initially, pursuant to SSA regulations and rulings, nurse practitioners, like Zeoli, are not "acceptable medical sources" whose opinions are entitled to controlling weight under the treating physician rule. Genier v. Astrue ("Genier I"), 298 Fed. Appx 105, 108 (2d Cir. Nov. 5, 2008) (summary order); Monguer, 722 F.2d at 1039 n. 2; 20 C.F.R. §§ 404.1513(a); 416.913(a); S.S.R. 06-3p. Rather, nurse practitioners are "'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." Genier I, 298 Fed. Appx. at 108; 20 C.F.R. §§ 404.1513(d)(1); 416.913(d)(1). Thus, the opinions of a nurse practitioner "do not demand the same deference as those of a treating physician." Genier I, 298 Fed. Appx. at 108.

In any event, where there is other substantial evidence in the record that conflicts with the treating physician's opinion, the opinion will not be afforded controlling weight, see Salmini, ___ Fed. Appx. ___, 2010 WL 1170133, at * 3, and "the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell, 177 F.3d at 133; cf. Klodzinski v. Astrue, 274 Fed. Appx. 72, 73 (2d Cir. Apr. 23, 2008) (summary order); 20 C.F.R. §§ 404.1527(d)(4); 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight [it] will [be] give[n] * * *.") Furthermore, "the ultimate finding of whether a claimant is disabled and cannot work [is] reserved to the Commissioner.'" Snell, 177 F.3d at 133 (quoting 20 C.F.R. § 404.1527(e)(1)); see also 20 C.F.R. § 416.927(e)(1). Accordingly, although the SSA must consider the data provided by the physicians, it must "draw its own conclusions as to whether th[at] data indicate[s] disability." Snell, 177 F.3d at 133.

Since Zeoli is a nurse practitioner, not a doctor, the ALJ was free to discount his opinions in favor of the objective findings of medical doctors. See, e.g. Genier I, 298 Fed. Appx. at 108.

Moreover, the ALJ noted that Zeoli's opinion should be given reduced weight because: (1) it was not supported by his own clinical notes of treatment, which indicate, *inter alia*, that plaintiff was not limited or impaired in many different aspects, including her ability to understand, remember and carry out simple job instructions, (Tr. 257), and that plaintiff had normal thought process and content, good memory and fair judgment, (Tr. 262-263); and (2) it was inconsistent with other objective medical evidence in the record from consulting physicians and plaintiff's own testimony regarding her limitations. For example, although Zeoli opined that plaintiff was markedly impaired in her ability to deal with the public, (Tr. 256), plaintiff testified that she got along great with customers and was "a people person." (Tr. 285). Accordingly, the ALJ properly afforded reduced weight to the opinion of Zeoli regarding plaintiff's functional assessment.

### b.    Dr. Shekher's Records

The ALJ's failure to consider the psychotherapy treatment records and progress notes of Dr. Shekher, which plaintiff contends would have supported a finding of disability, (Pl. Mem. At 3), does not require remand under the circumstances of this case.

When the ALJ has failed to consider evidence that "is significantly more favorable to the claimant than the evidence considered," remand is ordinarily required to permit consideration of the improperly excluded evidence. Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010). "Remand is unnecessary, however, '[w]here application of the correct legal standard could lead to only one conclusion.'" Id. (quoting Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998)); see also Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) (holding that "where application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require

agency reconsideration.")

Dr. Shekher's records reveal that plaintiff missed or canceled several appointments, (Tr. 207, 208, 211, 212, 213, 216, 217, 218); stopped taking her previously prescribed medication four (4) months prior to her first visit with Dr. Shekher, (Tr. 223); and was noncompliant with taking the medication prescribed to her by Dr. Shekher, even though she reported improvement in her symptoms of depression and mood swings when she took the medication. (Tr. 206, 208-211, 213). To the extent Dr. Shekher diagnosed plaintiff with a mental impairment(s), his records are essentially duplicative of the evidence considered by the ALJ and, in any event, Dr. Shekher failed to render any medical opinion regarding plaintiff's functional limitations resulting from those mental impairments. Thus, Dr. Shekher's records are not "significantly more favorable" to plaintiff than the evidence considered by the ALJ. See, e.g. Zabala, 595 F.3d at 409; Carvey v. Astrue, No. 09-4438-cv, 2010 WL 2264932, at * 1 n. 1 (2d Cir. June 7, 2010) (summary order) (finding that "no reasonable likelihood existed of a different outcome" than that the claimant was not disabled based upon the overlooked records because, *inter alia*, one of the doctor's whose statements were overlooked expressly deferred to another doctor's opinion regarding the claimant's limitations). In sum, since Dr. Shekher never rendered any opinion regarding any functional limitations resulting from plaintiff's mental impairments, his records are not inconsistent with the evidence upon which the ALJ relied in finding that plaintiff was not disabled and, thus, there is no reasonable likelihood that the ALJ would have found plaintiff disabled had he considered those records.

Furthermore, in order to be entitled to DI benefits or SSI, the claimant is required to follow all prescribed treatment if such treatment can restore his or her ability to work. See 20 C.F.R. §§

404.1530(a), 416.930(a). A failure to follow prescribed treatment "without a good reason" precludes a finding of disability under the applicable regulations. 20 C.F.R. §§ 404.1530(b), 416.930(b).[4] Since Dr. Shekher's records evidence plaintiff's failure to follow prescribed treatment that improved her symptoms, which would have precluded a finding of disability under the regulations had they been considered by the ALJ, those records are not "significantly more favorable" to plaintiff than the other evidence considered by the ALJ. Accordingly, remand is not necessary because there is no reasonable likelihood that the ALJ's consideration of Dr. Shekher's records would change his determination that plaintiff was not disabled. See, e.g. Zabala, 595 F.3d at 410.

c.    **Records from FSL and Dr. Smith**

Plaintiff's contention that the ALJ also neglected to fully consider evidence provided by the FSL and Dr. Smith, (Plf. Mem. at 3, 4), is without merit since the ALJ specifically referenced those records in his decision. (Tr. 21-22, 26). Moreover, the records of those treating sources are not "significantly more favorable" to plaintiff and the only record from FSL during the relevant period indicates that plaintiff was discharged from the Family Program due to "loss of contact." (Tr. 146).

---

[4] The examples of good reasons for not following prescribed treatment provided in the regulations are not relevant here, insofar as they involve the established teaching and tenets of the claimant's religion; cataract or other surgery; treatment that is "enorm[ous]," "unusual" or otherwise "very risky;" and amputation. 20 C.F.R. §§ 404.1530(c); 416.930(c).

### d. Consideration of Plaintiff's Daily Activities

Plaintiff's contention that her activities of daily living are not indicative of the ability to perform substantial gainful activity, (Plf. Mem. at 9-10), is also without merit.

Pursuant to SSA regulations, "it is entirely appropriate for an ALJ to consider a claimant's daily activities in assessing her credibility and capacity to perform work-related activities." Lamorey v. Barnhart, 158 Fed.Appx. 361, 363 (2d Cir. Jan. 19, 2006) (summary order); see also Genier II, 606 F.3d at 50 (holding that the ALJ was required to consider all of the record evidence, including the plaintiff's testimony and other statements with respect to his daily activities); 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i). Evidence of a claimant's daily activities is an "important indicator" of the intensity and persistence of his or her symptoms. See 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3).

Plaintiff's activities of daily living include: taking care of, and playing with, her children; cooking, cleaning, bathing and dressing herself daily; doing laundry, albeit with assistance carrying the laundry basket, and shopping once a week; watching television; reading; socializing with friends; and attending NA meetings, counseling, doctor's appointments, physical therapy and church as needed. (Tr. 111-114, 164, 170, 280, 293-295, 298). In addition, plaintiff leaves her home everyday and is able to go out alone and drive. (Tr. 111-114). Although a claimant who "gamely chooses to endure pain in order to *occasionally* pursue important goals" should not be penalized therefore by finding him or her not disabled, see, e.g. Balsamo v. Chater, 142 F.3d 75, 81-2 (2d Cir. 1998) (emphasis added), plaintiff's testimony indicates that she performed many of her daily activities on a regular basis and that she also engages in social activities. Therefore, the ALJ properly considered plaintiff's daily activities in determining both the severity of her

impairments and her RFC.  See, e.g. Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009) ( finding that the ALJ correctly noted that the claimant was able to care for his one-year-old child, including changing diapers; occasionally vacuumed, washed dishes and drove; and watched television, read, and used the computer).

### 3.    RFC Assessment

When a claimant's impairments fail to meet or equal any of the Listings, the Commissioner must assess the claimant's residual functional capacity ("RFC") before proceeding to the fourth and fifth steps of the sequential analysis.  See 20 C.F.R. §§ 404.1520(e); 416.920(e).  A claimant's RFC is "the most [he] can still do despite [his] limitations."  See 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Upon assessment of a claimant's RFC, the Commissioner must consider all of the claimant's medically determinable impairments, including those that are not found to be "severe." 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).  The Commissioner's assessment must be based on "all of the relevant medical and other evidence" in the case record, including any statements about what the claimant can still do that have been provided by medical sources and any descriptions and observations about the claimant's limitations from his or her impairments, including limitations resulting from his or her symptoms, such as pain, made by the claimant or any other person.  See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  In addition, in assessing a claimant's RFC, the Commissioner must consider the claimant's "ability to meet the physical, mental, sensory, and other requirements of work."  20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4).  Both a "limited ability to perform certain physical demands or work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or

43

postural functions, such as reaching, handling, stooping or crouching)," 20 C.F.R. §§ 404.1545(b),

416.945(b), and a "limited ability to carry out certain mental activities, such as limitations in

understanding, remembering, and carrying out instructions, and in responding appropriately to

supervision, coworkers, and work pressures in a work setting," 20 C.F.R. §§ 404.1545(c),

416.945(c), may reduce a claimant's ability to do past or other work.

> The applicable regulations further provide that:

> "[w]hen [a claimant] ha[s] severe impairment(s), but [his or her] symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in [the Listings], [the Commissioner] will consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe, in determining [his or her] residual functional capacity. Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone; * * *. In assessing the total limiting effects of [a claimant's] impairment(s) and any related symptoms, [the Commissioner] will consider all of the medical and nonmedical evidence, * * *."

20 C.F.R. §§ 404.1545(e), 416.945(e). Thus, in "determining a claimant's RFC, the ALJ is

required to take the claimant's reports of pain and other limitations into account...but is not

required to accept the claimant's subjective complaints without question; he may exercise

discretion in weighing the credibility of the claimant's testimony in light of the other evidence in

the record." Genier II, 606 F.3d at 49 (citations omitted).


### a.    Consideration of Mental Impairments

Plaintiff challenges the ALJ's conclusion that she is able to understand and remember

simple, routine instructions, carry out repetitive tasks, make simple work related decisions, use

common sense and deal with minor or few work changes in a routine work setting and, thus, has

the residual functional capacity to perform sedentary work. (Pl. Mem. at 1). According to

plaintiff, the ALJ's findings were "based mostly or entirely upon the exertional limitations with little or any weight given to [her] mental impairments." (Id.).

Contrary to plaintiff's contention, the ALJ based his assessment of her RFC, in part, on the consistent reports submitted by (1) Zeoli, the most recent treating source who rendered an opinion regarding the affect of plaintiff's mental impairments on her RFC; (2) Dr. Herman, the SSA's consultative psychological examiner; and (3) Dr. Kessel, the SSA's consultant regarding plaintiff's mental RFC assessment. Specifically, Zeoli opined that plaintiff had a fair ability to understand, remember and carry out simple job instructions, maintain personal appearance, demonstrate reliability and maintain schedules in a daily routine, (Tr. 257); Dr. Herman opined that plaintiff was able to follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule and learn new tasks, (Tr. 170); and Dr. Kessel opined that plaintiff can understand, remember and carry out simple and detailed instructions, concentrate for extended periods of time and adequately adapt to changes in her work environment, and that she was only mildly limited in her ability to maintain concentration, persistence or pace. (Tr. 182). Accordingly, the ALJ's RFC assessment is supported by substantial evidence in the record.

### 4. Step Five[5]

Since, for the reasons set forth above, the ALJ's determination to assign reduced weight to Zeoli's opinion and his assessment of plaintiff's RFC are supported by substantial evidence, the

---

[5] The ALJ's determination at the fourth step of the sequential analysis, i.e., that plaintiff is unable to perform her past relevant work, is favorable to plaintiff. Neither party challenges that determination.

first hypothetical he presented to the vocational expert was an accurate portrayal of plaintiff's limitations and capabilities. Accordingly, plaintiff's contention that the second hypothetical that the ALJ presented to the vocational expert is more reflective of her capabilities and limitations than his first hypothetical, and, therefore, should have been afforded more weight, must necessarily be rejected. See, e.g. Carvey, 2010 WL 2264932, at * 3 (holding that because substantial evidence supported the Commissioner's assessment of the claimant's RFC, the claimant's vocational expert challenge necessarily had to be rejected). Considering plaintiff's age, education, work experience and residual functional capacity, and based upon the medical and other evidence in the record, including the testimony of plaintiff and the vocational expert, the ALJ's determination that plaintiff has the ability to perform jobs that exist in significant numbers in the national economy was not erroneous and is supported by substantial evidence in the record.

## III. CONCLUSION

Based upon the foregoing, the Commissioner's motion for judgment on the pleadings is granted and his decision is affirmed.

SANDRA J. FEUERSTEIN
United States District Judge

Dated: August 20, 2010
Central Islip, New York